## Case No. 12,326.

### The SANTA CLAUS.

[1 Blatchf. 370.] [1]

Circuit Court, S. D. New York. Oct. Term, 1848.[2]

COLLISION—ON HUDSON RIVER—LIGHTS—WHOLLY IN FAULT.

Where a collision occurred between two steam vessels, the O. and the S., on the Hudson river, the former going up and the latter down, and it appeared that the O. had but one light, that the night was dark and the weather thick and cloudy, and that, under those circumstances, a vessel carrying but one light, though moving, appears to an approaching vessel as if at anchor, and her course can be determined only when very near, *held*, that even though the S. mistook the position of the O., yet as the want of two lights on the O. was calculated to and probably did mislead, the S. was not wholly in fault.

[Appeal from the district court of the United States for the Southern district of New York.]

George W. Aspinwall and others, owners of the propeller Ocean, filed a libel in rem, in the district court, against the steamboat Santa Claus, to recover damages caused to the former vessel by a collision with the latter in the night time, on the Hudson river, just above Dunderbarrack Point, about 42 miles from New York, the propeller being bound up the river and the steamboat coming down. Both vessels were very much injured. The district court decreed in favor of the libellants [Case No. 12,327], and the claimants appealed to this court. The answer was amended in this court, and a large amount of additional evidence was taken, which varied the case altogether from that presented below. The facts sufficiently appear from the opinion of the court.

Erastus C. Benedict, for libellants.
Edward Sandford, for claimants.

## Case No. 12,327.

### The SANTA CLAUS.

[1 Olc. 428.] [1]

District Court, S. D. New York. Oct., 1846.[2]

COLLISION — ADMISSIONS IN ANSWER — LIGHTS — RULE OF PASSING—CULPABLE NEGLIGENCE.

1. In an action in rem for a collision, the answer of the owners of the colliding vessel admitting facts to their prejudice will prevail in favor of the libellants against the testimony of the pilot of the vessel to the contrary.

2. There is no positive provision of law compelling a steamboat running on inland waters in the night time. to carry two signal lights, one in her bows and the other suspended above the deck at her stern.

3. The practice is an usual and useful one, and the omission to set them will be evidence of culpable negligence in the complaining vessel; but if the pilot of the colliding vessel discovers her bows and heading. the absence of a head light upon her is no excuse for the collision.

---

1 [Reported by Samuel Blatchford, Esq., and here reprinted by permission.]
2 [Reversing Case No. 12,327.]

1 [Reported by Edward R. Olcott, Esq.]
2 [Reversed in Case No. 12,326.]

4. The rule that two steam vessels going in opposite directions, and meeting in the night time, shall each port her helm, and both pass to the larboard, is not of absolute obligation.

5. When one steamboat is ascending a river at her larboard side, within sixty or seventy feet of the shore, and another is descending on her starboard so far off as to leave ample room for her safe passage, the two are not so meeting, within the sense of the rule, as to justify the descending boat attempting to run in shore of the other, or to require the latter to port her helm and steer to the starboard.

6. A propeller, heavily laden, going up the Hudson river in the night, against an ebb tide, is justified by the usages of the river navigation, and upon general principles of marine law, to hug the western bank at or near Dunderbarrack Point, for the advantage of an eddy or slacker tide supposed to be found there, and other boats passing in the opposite direction are to be presumed cognizant of such usage and opinions, and are bound to take precautions accordingly.

7. The question of culpable negligence is not determinable absolutely by any rule of navigation. These rules are not inflexible, and a vessel which adheres to them in form may still be, at the same time, guilty of a tortious injury to another which fails to observe them.

[Cited in The Pilot, Case No. 11,168.]

[Cited in Austin v. New Jersey Steamboat Co., 43 N. Y. 78.]

The passenger steamboat Santa Claus, going down the Hudson river, and the iron steam propeller Ocean, proceeding up the river, deeply loaded with coal, came in collision about twelve o'clock on the night of the 5th of June, 1846, a quarter of a mile above Dunderbarrack Point, at the foot of the Horse Race. The larboard guard of the Santa Claus was broken up, the outer timber wrenched off and driven nearly through the propeller, breaking a hole in her starboard bow, and was found passed athwart her seventeen feet under her upper deck. The Santa Claus received great damage in her guard timbers, wheel paddles and arms. The owners of the propeller attached the steamer, claiming compensation for the injuries caused by the negligence or want of skill of the persons managing her. The case set up by the respective parties by the libel and answer is this: The libel alleges that the propeller is owned in Philadelphia, is of 190 tons burthen, and sailed from that port for Albany and Troy, on the 4th of June; that on the night of the 5th she was violently and carelessly run into by the Santa Claus, about forty-two miles above New-York, a few rods above Dunderbarrack Point, the propeller then having two signal lights burning, one at the stem and the other at the main gaff; that the blow made a breach in her starboard bow, six feet in length by three feet in width. That the tide was ebb and strong and wind ahead, and the propeller was not making headway exceeding four miles the hour; that to avoid the strength of wind and tide the propeller was kept close to the west side of the river, not more than three or four rods from the shore, after leaving Caldwell's landing. That on doubling Dunderbarrack Point, the Santa Claus was discovered coming down the river one-third across from the eastern shore, and apparently heading directly down the reach, on a line far eastward of the propeller and her course. That the propeller continued close to the west shore, till observing the Santa Claus had suddenly changed her course and was apparently heading directly for the propeller, when her helm was put hard a port, and her engine was stopped and backed, so that her headway became entirely deadened, and her engine kept rapidly backing when the Santa Claus ran upon her at high speed, striking her on her starboard bow with the larboard bow of the Santa Claus, causing the injuries before specified. That the propeller was at the time on a proper, safe and usual course in navigating that portion of the river, and did every thing promptly which ought to have been done to avoid the collision, and that it was out of her power to do so; but the Santa Claus, with ease and safety, could have avoided the collision, if those navigating her had not unskilfully and negligently steered across and upon the bows of the propeller; and that the damage was occasioned by the fault and mismanagement of the Santa Claus, and not that of the propeller. The answer denies generally the statement of particulars made by the libellants, and avers that the facts were—That at about midnight of the 5th of June, the Santa Claus was running down the river on the usual and proper track and course, with an ordinary head of steam, and at the rate of from twelve to fifteen miles the hour, and at a quarter of a mile above the turn of the Dunderbarrack, her pilot discovered the propeller below, half a mile to the southward and eastward, and three or four hundred yards from the western shore, having one light elevated above her decks, two masts, and her sails down, and he supposed her a vessel at anchor, her head being up the river. That the pilot and crew of the Santa Claus did all in their power, and exercised proper and due vigilance and skill to avoid the collision, and that it was caused by the wilful ignorance, carelessness and negligence of the master, pilot and crew of the propeller. That it is usual and customary, and the law of the river for steamboats going up in turning Dunderbarrack Point, to keep well to the eastward, so as to leave room for boats coming down to make that turn in safety; that the pilot of the propeller failed so to do, but headed to the northward and westward in violation of his duty, &c., &c. That steamboats meeting on the river are each bound to port their helm and turn to starboard or the right, so as to pass with safety to the larboard of each other, but the pilot of the propeller ignorantly and carelessly neglected so to navigate his vessel; but on the contrary, starboarded his helm and steered to the larboard. That the propeller was bound by law and the usage and custom of the river to carry and show two sufficient lights, one at her stem and the other raised above her stern, but

that she had at the time no light at her stem; and that at the time of the collision she was widely out of her proper track and place. The answer also charges the ignorance and incompetency of the pilot and crew of the propeller.

The points contested upon the hearing, and to which numerous witnesses were examined, turned chiefly on the inquiry whether the propeller was guilty of culpable negligence on the occasion which caused the collision complained of. Those charged against her related to her position in the river and her proximity to the western shore, and particularly to her omission to display a stem and stern light; and that running with only a light hoisted above her stern disabled the Santa Claus determining how she was heading, and from taking proper measures to avoid her. Much time was consumed in taking proofs on that branch of the defence. It was overlooked on both sides, until the evidence had closed and the argument was opened, that it was stated in the answer "that the pilot (of the Santa Claus) discovered a vessel with two masts and her sails' down, distant about half a mile to the 'southward and eastward, and about three or four hundred yards from the western shore; he supposed it to be a schooner at anchor, her head being up the river." This dispenses with the necessity of setting forth in detail the evidence given to this point by both parties. It was regarded as a cardinal fact, touching the condition and navigation of the propeller, to ascertain whether she was so fitted and conducted as to render it uncertain to the approaching vessel how she was heading, and the explicit declaration of the claimants in their answer that the pilot knew her head was up the river being considered by the court conclusive against them on that point, the evidence at large is omitted.

The other facts in the case will sufficiently appear in the opinion of the court.

E. C. Benedict, for libellants.

Geo. F. Schufeldt, for claimants.

BETTS, District Judge. The libel and answer stand in flat contradiction in respect to the courses and positions of the two vessels immediately preceding the collision. The statements in these pleadings do no more than form issues between the parties upon all the material facts connected with the transaction, except in one particular, in which the answer makes an allegation affording evidence in behalf of the libellants, which, in my judgment, disposes of that branch of the controversy. The proof is pretty satisfactory that the propeller had but one light burning at the time she was first seen from the Santa Claus. The one placed at her bow, as the night came on, had burned out, or was extinguished without the knowledge of her crew, when the two vessels came in sight of each other.

The testimony of masters and pilots experienced in the navigation of the river prove clearly that placing one light above the stern of a steamer, and another in her bows, is of essential aid to vessels meeting her in determining her true position and course. The law requires at least one light to be plainly exposed (Act July 7, 1838, § 10 [5 Stat. 306]), and the practice of exhibiting two in the above arrangement has become so general as to authorize the presumption that navigators will be governed by the expectation that all steamers in motion in the night time conform to it. The necessity or value of this trim consists in its furnishing a sure means to vessels nearing her to determine the direction of her head. This the experts almost unanimously testified could not be ascertained by the stern light without the aid of a head light. The omission of that signal, without other equivalent warning, would, in my opinion, show the propeller guilty of negligence or misconduct, and would excuse the Santa Claus in not employing higher care and precaution for avoiding her. Bullock v. The Lamar [Case No. 2,129]. That ground of defence is taken from the claimants by their answer, and they must be held to have known the position and direction of the propeller, as well from seeing her stern light and the direction of her head or bows, as if a light had been at her stem also. Steamers are not required by positive law, nor any authenticated custom of the maritime law, to carry and exhibit a light both on the stem and stern when running in the night time. It has become a common and commendable practice to do so, particularly in the navigation of inland waters, as an increased measure of precaution. It would undoubtedly, in this instance, have afforded the Santa Claus a better means, in connection with the stern light, to determine the bearing of the propeller than she could derive from the exhibition of a stern light alone, and that, in a nautical point of view, is all the importance of having two lights. The act of congress (July 7, 1838, § 10) compels steam vessels to carry one or more signal lights at night. No edict of any maritime code is shown requiring more than one to be exhibited. And it is of no consequence whether any light is shown, if the approaching vessel has plain notice without it, of every thing its exhibition could communicate. Here the pilot of the Santa Claus saw the bow of the propeller. That supplied him a range line to her stern, and thus apprised him whether she was at anchor swinging on the tide, or moving towards him on a direct or oblique line.

The only essential fact, then, to be determined is, whether the propeller was in a wrong position, or was unskilfully or carelessly navigated in reference to the course and position of the Santa Claus. If, however, the claimants became in that manner apprised of the heading of the propeller, the blame of the collision would be cast upon

them, leaving no ground of excuse because notice was not given of her direction by a signal light at her head. The maritime law settles no determinate course or direction vessels are bound to take when approaching each other. The exigencies of the particular case must govern. There are general rules of navigation which furnish guides on ordinary occasions, but they do not necessarily excuse or charge fault or liability in all cases of collision. One of those usages and rules is, that steamboats running in opposite directions shall, when meeting on coincident or approximating lines, port their helms or bear off to starboard, and thus give each other a berth to larboard. The usages in the United States and the Trinity rules in England recognise this mode of navigation as the proper one to be pursued, and a deviation from it will raise a presumption of want of skill and good conduct in the vessel committing such deviation. But none of those rules are absolutely inflexible. They give way and accommodate themselves to emergencies as they arise. They are employed as standards by which courts of admiralty regulate, in a general sense, their appreciation of the care, skill or fidelity with which the respective vessels have performed their duties in case of a collision. Westm. Rev., No. 42, Sept., 1844; 3 Kent, Comm. 230; The Hope, 1 W. Rob. Adm. 157; The Friends, Id. 478; Abb. Shipp. 308. And this state has, by statute, established a like provision. 1 Rev. St. p. 682, § 1.

It is not definitely settled what the bearing of approaching vessels must be towards each other to constitute a meeting, within the legal import of the term. It probably would be understood to signify that when the advance of the vessels in a common direction which must apparently, if continued, bring them into collision, each must then change her course by bearing off to the right, or show adequate reasons excusing that movement. The purpose and spirit of these laws of navigation aim at the safety of the vessels. The method designated is wholly secondary, and every rule is satisfied when the vessels go clear, although they pass each other on the starboard side and in near contiguity. The Friends, 1 W. Rob. Adm. 478. It is eminently proper that a strict observance of any of these regulations should be avoided when there is a plain risk in adhering to them, and it is entirely in the power of either vessel to escape a collision by departing from the methods prescribed by the rules. But I should think this a case in which the customary mode of porting the helm was properly adopted by the Santa Claus, provided the evidence showed that the two boats were meeting in the sense of the rule, when she bore off to the right.

In the agitation and confusion necessarily attendant upon a collision in the night time, it must always be difficult to determine, with reasonable certainty, how either vessel was conducting at the moment, or what would

have been the best measure either or both could have pursued in the exigency to avoid or lessen the danger. In the present case, when the danger of collision was discovered to be imminent, the two vessels were crowded towards the west shore, the persons on board of each believing the other vessel was furthest out in the river, and pressing on them from that direction. It is testified by the pilot of the Santa Claus and several hands on board her, that they observed the propeller down the river, east of their course, and heading westwardly towards them, and they ported their wheel once, and quickly repeated the movement, pressing it down until their boat was brought within fifty feet of the west shore, where the propeller drove into her, bows on, just abreast her wheel guards, and fifty feet aft her stem. It is incredible that those witnesses could have been aware of the nearness of their vessel to the west shore when they made that movement, for it involved her inevitable destruction had she not been intercepted by the propeller. She was arrested in full speed at fifty feet from the shore. Nothing in her power to do could have saved her at that point from going head on upon the rocks. The pilot, engineer and firemen of the propeller testify that the Santa Claus, immediately before the collision, varied her course from one straight down the river and well east of them, to the starboard, and directly towards them, and came down upon them whilst they were endeavoring to escape her, just passing her stem across the propeller, and striking her starboard bow with the larboard guards of the Santa Claus, and with such force as to break off the facing of her guard and drive it entirely through the propeller.

The disaccord in the opinions of the witnesses as to particulars connected with the collision would naturally arise from the perturbation of the moment, and the different positions from which objects were viewed by them, and the court might be compelled, if the testimony was confined to the facts observed when the vessels were in the act of striking, to regard the fault as inscrutable, or equally imputable to both parties. But it seems very plain to my mind, from all the circumstances in proof, that the pilot of the Santa Claus mistook the position of the propeller, from the time he first observed her, and that her position and course was always westward of his position and course, and not to the eastward, as he supposed, and under that misapprehension he made the desperate attempt to crowd his vessel between the propeller and the shore, thinking, no doubt, he was several hundred yards east of it. The testimony of Babcock, May and Bradley, on board the propeller, is positive that she was running close to the west shore, within a distance of four or five rods. The pilot states that he hugged the rocks as near as was safe. This evidence is corroborated by Peter Van Elton, who observed the progress of the boat from his ves-

sel. (anchored near Caldwell's.) He says, "She sheered in near Caldwell's, close to the shore, and kept close round the point, going round it a short distance from it." Although Morey, pilot of the Santa Claus, Conklin and Turner, who were in the wheel-house with him, and Hubbard, a deck hand, all testify that the propeller, when seen by them, was three or four hundred yards eastward of the point, (or one-third of the width of the river,) and east of the Santa Claus, so far as to leave ample room for the latter to pass to the west, yet this is only matter of opinion and estimate; they point to no fixed objects which enabled them to form that judgment or verify its justness. The answer is probably incorrectly copied in stating "the Santa Claus was a quarter of a mile above the turn, (at the point,) when she discovered the propeller, about half a mile to the southward and about three or four hundred yards from the western shore," because the testimony of the pilot and other witnesses speaking to that fact all represent the Santa Claus as one-half or a mile above the point when they discovered the propeller to be in motion, and they allege the collision actually took place a quarter of a mile above the point. This must manifestly be what the claimants intended to aver in their answer.

The preponderance of evidence upon these statements is clearly with the libellants. Their witnesses, all on the propeller but one, speak with certainty as to her position in relation to the west shore, a line of land almost within their reach, whilst those of the claimants were out in the river upon a vessel moving rapidly, and they judge from the apparent bearing of a high light, distant from them half a mile or a mile, and looked at in the night time in thick weather. In these circumstances it would be more probable they would mistake largely her distance from the shore than that her officers and crew could. The facts proved on both sides, moreover, support the superior accuracy of the libellants' witnesses on this point. The vessels came together eighty rods above the point, and only fifty or sixty feet (between three and four rods) from the west shore. They were running at the relative speed of four to one, the Santa Claus going twelve to seventeen miles the hour and the propeller three to four, and accordingly the former would come down the river a mile whilst the latter was ascending a quarter of a mile, and assuming that the Santa Claus was at either point of distance testified to by her pilot and crew, above the place of collision when she sheered off westwardly, it would be physically impossible that the propeller could have advanced up the river three-quarters of a mile, and westwardly three or four hundred yards, during the time the Santa Claus, at her high speed, was descending one-half a mile or a mile. The direction of the propeller westwardly, observed by the Santa Claus, could not have

been, therefore, as supposed on board the latter, a course commenced whilst the former was still below, and several hundred yards east of the point, but must have been, as described by the pilot of the propeller, her direction on turning the point of rocks and hugging close to the west shore, which, according to the chart and diagrams of the river in proof, would necessarily lead her to steer and head N. W. and W. N. W. It is palpable that the pilot of the Santa Claus must have miscalculated the distance of the propeller from him and the shore, when he made his sheer west, and followed it by a second one to counteract her bearing in that direction. His movements made after he had passed Van Wagenen's Island would, consistently with all the testimony, account for his intercepting the propeller at the spot the two vessels struck. The diagrams and the line of courses described by the different experts, and concurred in by those managing the Santa Claus, connected with the testimony in the cause, demonstrate, to my judgment, that the error was wholly on the part of the Santa Claus, and that if she had not sheered to the west, but had held the course she had been running to the moment of porting her helm, she would have gone widely to the east of the propeller, or, had only one sheer been made, would have cleared her. A slight angle of deviation to larboard, commenced three or four hundred yards off, would certainly have brought the Santa Claus east of the track of the propeller; because she had been worked round at right angles to the shore when brought into collision, in running less than that distance on her sheer to starboard. The effort to get the shore side under a wrong impression of the true distance and course of the propeller, thus brought the Santa Claus almost perpendicularly across the path of the latter; indeed a tangent further round, for her port guards struck the starboard bow of the propeller.

The true position of the two vessels relative to each other, and their respective movements being thus ascertained, the remaining inquiry is, whether the propeller had wrongfully placed herself in the way of the Santa Claus, or, which is the same thing, whether she was blamable for not going to the eastward of the latter. The lights of the Santa Claus were distinctly seen when she came round the Nose, by the pilot of the propeller, the latter then being off the point of rocks, probably from one to two miles distant from the Santa Claus. He had before determined to run close to the west shore, and accordingly took no precautions in respect to the Santa Claus, leaving her an abundant breadth of channel to the east. Admitting that the two vessels were at that time on the same north and south line, on the track proper for the Santa Claus to pursue, and which the pilot of the propeller was bound to suppose she

would hold, was he required to go east of that line, so as to keep the Santa Claus on his larboard side, or could he justifiably course up along shore west of it? The usage or law is by no means peremptory or inflexible, that steamboats shall each steer to the right when approaching and meeting on the same track. Like other general rules this must yield to the necessities and reason of particular cases, even when the vessels are brought into dangerous proximity, and each relies upon the other that her movements will conform to that rule. Abb. Shipp. pp. 311, 312, § 4. Reefs or shoals, or other impediments in the way, eddies, currents or tides may impede or prevent one vessel observing the rule on her part, and cast on the other the duty of avoiding her; or she may take a course opposite to that indicated by the rule when there is reasonably ground to believe such proceeding necessary to her safety or more secure navigation.

In the case of The Friends, Dr. Lushington discusses the effect of extraordinary contingencies, and holds that they must afford exceptions to the standing rule, however positive its terms may be, and in that case admitted a vessel, though out of the required course, to recover damages sustained from a collision in that situation. 2 W. Rob. Adm. 485. A circumstance adverted to as of weight in that case also exists in this, that the vessel was deviating from the course prescribed by the rule of navigation with a view to a more favorable state of tide. The testimony of the pilot of the propeller is corroborated by that of experts upon the river, that in a strong ebb-tide there is a species of eddy or reaction of tide close in by Caldwell's or the point, which aids a vessel ascending; and even if this was a mistaken opinion, the pilot should be presumed to have acted under an honest persuasion that such was the fact, and to have passed close up the west shore to avail himself of that advantage, his vessel being heavily loaded and of feeble propelling power. This consideration would be of weight to show that he was not proceeding negligently and improvidently in that direction, but I think the fair weight of evidence proves an advantage was to be obtained by him in that mode of navigation, and it was the duty of the Santa Claus to have anticipated that slow vessels might be found at such state of tide in that locality, and shaped her course to meet the contingency. This case was a disastrous one to the Santa Claus, both in injuries to the boat, and more especially in the destruction of the life of a person on board; and from the nature of her employment, as well as the character of her officers and crew, no imputation can justly be made of want of skill for her management, or of an anxious desire to employ it, so as to protect herself and other vessels she might encounter. But on the evidence I am constrained to say, that on the occasion

in question she was, through mistake and want of proper precaution, put off the proper course, so as to bring her into collision with the libellants' vessel, and cause an injury to the latter, which the owners of the Santa Claus are bound to indemnify.

I shall accordingly decree that the libellants recover their damages occasioned by the collision, and that the Santa Claus be condemned in the amount. It must be referred to a commissioner, upon the proofs in court and other pertinent evidence, to inquire into, ascertain and report these damages to this court.

NOTE. The above case was removed by appeal to the circuit court, where "the answer was amended, and a large amount of additional evidence was taken which varied the case altogether from that presented below;" and in October term, 1848, the decision of the district court was reversed. [Case No. 12,326.] No opinion at large was given by the circuit court, and the decision of the court below is therefore reported.